**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

                          Case No. 1:20-MJ-153
            Plaintiff,                    (HJK)

vs.                                 September 28, 2020

PASCALE CECILE VERONIQUE FERRIER,

                  Defendant.
_____


        **TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING**
        **BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.**
                **UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:           JAMES P. KENNEDY, JR.
                       UNITED STATES ATTORNEY
                       BY: TIMOTHY C. LYNCH, ESQ.
                       Assistant United States Attorney
                       Federal Centre
                       138 Delaware Avenue
                       Buffalo, New York 14202
                       For the Plaintiff

                       OFFICE OF THE FEDERAL PUBLIC DEFENDER
                       BY: FONDA DAWN KUBIAK, ESQ.
                       Assistant Federal Public Defender
                       300 Pearl Street
                       Suite 200
                       Buffalo, New York 14202
                       For the Defendant

INTERPRETER:           AFAF JEAN PICKERING, French Interpreter

PROBATION:             BRIAN M. MAMIZUKA, USPO

DEPUTY CLERK:          LLANE M. GUIDOTTI

COURT REPORTER:        ANN M. SAWYER, FCRR, RPR, CRR,
                       NYRCR, NYACR, Notary Public
                       Robert H. Jackson Courthouse
                       2 Niagara Square
                       Buffalo, New York 14202
                       Ann_Sawyer@nywd.uscourts.gov

```
 1                (Proceedings commenced at 2:11 p.m.)

 2           THE CLERK:  All rise.  United States District Court

 3    for the Western District of New York is now in session, the

 4    Honorable H. Kenneth Schroeder, Jr. presiding.

 5           THE COURT:  Be seated, please.

 6           THE CLERK:  The United States versus Pascale Cecile

 7    Veronique Ferrier, docket number 20-M-153.

 8           This is the date set for an identity hearing,

 9    arraignment, and detention hearing.

10           Assistant United States Attorney Timothy Lynch

11    appearing on behalf of the government.

12           Assistant Federal Public Defender Fonda Kubiak

13    appearing with defendant.

14           United States Probation Officer Brian Mamizuka, and

15    French Interpreter Afaf Jean Pickering.

16           THE COURT:  Good afternoon.

17           ALL PARTIES:  Good afternoon, Judge.

18           THE COURT:  Do we have participants by phone again?

19           THE CLERK:  We do.

20           THE COURT:  All right.  For those who are listening

21    by telephone, I must once again admonish as follows:

22           Everyone who is present by way of audio conference is

23    admonished that recordings or recording any audio of this

24    court proceeding is strictly prohibited.  You may not record

25    any audio of any part of this proceeding.  You may not let
```

1    anyone else record any audio of this court proceeding.  There

2    are serious possible sanctions for a violation of these

3    prohibitions on recording including, among other things, a

4    finding of contempt of court.

5            There is a housekeeping matter that I want to first

6    address.  And it appears, Mr. Lynch, that we have fallen back

7    into the old problems of orders to produce.

8            I've been advised today that the Marshal Service

9    indicated it did not get an order to produce and, therefore,

10   it had not made arrangements to have the defendant present,

11   that it was now, as its procedure, relying on the so-called

12   calendar entries made by the court deputy.

13           But as far as I know, we have never eliminated the

14   orders to produce procedure after the Yukon calendar process

15   was scrapped, and the order to produce filing is the

16   obligation of the U.S. Attorney's Office.

17           As I indicated in the past, during my numerous

18   frustrations when defendants were not brought in, it was a

19   matter for the executive branch of government to solve, since

20   the Marshal Service is part of the executive branch, and the

21   U.S. Attorney's Office is part the executive branch.

22           And when we schedule things, we note them in a

23   calendar electronically, but that does not eliminate the need

24   for an order to produce because the Marshal Service takes the

25   position that, well, sometimes they don't get the calendar or

1  don't look at the calendar until just the day or two before

2  and, therefore, they're not always aware of when they're

3  supposed to produce somebody.

4       I'm not going to get into that situation as to who

5  is, once again, responsible for the failures, because it's all

6  resting with the executive branch of government.

7       MR. LYNCH:  And, Judge --

8       THE COURT:  It's -- wait -- it's not the Court's

9  obligation.

10       MR. LYNCH:  I wasn't going to say that.

11       THE COURT:  It's not the Court's obligation to issue

12  an order to produce.

13       And what I'm asking is that you report back to

14  U.S. Attorney Kennedy, and ask that he issue a directive to

15  all assistants that they have an obligation, especially in

16  criminal cases, to make sure that the appropriate order to

17  produce for a defendant who is detained is, in fact, served in

18  a timely way to the Marshal Service, and --

19       MR. LYNCH:  And, Judge, I'll just respond and say

20  that Chief Judge Geraci and United States Attorney Kennedy

21  last year dealt with this issue.  And it was my understanding,

22  through conversations with United States Marshal Charles

23  Salinas, that the marshals were going to check every Friday

24  with the Court, no longer were we going to have to issue

25  orders to produce at all, and they were going to rely on the

1    Marshal Service checking with the Court, finding out who needs

2    to be produced, and then they would produce them.

3         And Lee Eckenrode confirmed that today saying orders

4    to produce haven't been done in over a year.  So, now --

5         And the other thing I would add, Judge, is I -- we

6    lay no blame on the Court this morning.

7         THE COURT:  There is no legitimate --

8         MR. LYNCH:  There is none.

9         THE COURT:  -- there's no legitimate basis --

10        MR. LYNCH:  Well, yeah.

11        THE COURT:  -- to lay claim --

12        MR. LYNCH:  Yeah.

13        THE COURT:  -- on --

14        MR. LYNCH:  There wouldn't be.

15        THE COURT:  -- the Court.

16        MR. LYNCH:  And -- and I made efforts right away to

17   make sure the FBI brought her to court today in a timely

18   manner.  Here she is.

19        THE COURT:  I'm not criticizing you, Mr. Lynch.

20        MR. LYNCH:  Okay.

21        THE COURT:  I'm not criticizing you, at all.  I'm

22   just pointing out this frustration that I've had for I don't

23   know how long about the executive branch of government and its

24   inter agencies not being able to communicate and solve simple

25   problems.  At one time, we did solve it.  The Court solved it,

1  along with the assistance of the clerk's office by creating

2  what was called the Yukon calendar.  When entries were made,

3  that went on automatically to the calendar of the

4  U.S. Attorney's Office, the calendar of the Marshal Service,

5  the calendar of the Court, the calendar the U.S. Probation

6  Office, and everybody had it at the same time, and we could

7  trace those calendar entries if somebody claimed they didn't

8  get it.

9         All I'm saying is, we cannot have this situation

10  develop as it has existed in the past of defendants not being

11  produced.  And I will tell you that if it does occur, and it's

12  not the responsibility of the Court, and it falls within the

13  executive branch, the time lost is going to be counted against

14  the government for speedy trial purposes.

15         MR. LYNCH:  Thank you, Judge.

16         THE COURT:  Thank you.

17         All right.  Since our last appearance, I have been

18  advised that a grand jury sitting in the District of Columbia

19  returned an indictment against an individual named Pascale

20  Cecile Veronique Ferrier.  But we still have the issue of the

21  identity of the person named in the indictment, and the

22  identity of the person who appears before the Court here

23  today.

24         So, Ms. Kubiak, let me ask you first, if you have

25  received a copy of that indictment returned by the District of

1   Columbia?

2           MS. KUBIAK:  I have, Your Honor.

3           THE COURT:  So would you not agree that, for purposes

4   of the probable cause issue, that issue is now moot by reason

5   of an indictment?

6           MS. KUBIAK:  Yes, I would agree with that,

7   Your Honor.

8           THE COURT:  But it would still appear, unless the

9   defendant indicates otherwise, that there is an issue of

10  identity?

11          MS. KUBIAK:  Judge, although the government does have

12  the burden of showing that the defendant is the person wanted

13  in the District of Columbia where the charges are pending,

14  Ms. Ferrier is not at this time requesting an identity

15  hearing, and will waive such.

16          THE COURT:  All right.  The defendant, having now

17  waived her right to what is known as an identity hearing, the

18  only other issue to be resolved at this stage is whether the

19  defendant should be released and allowed to voluntarily return

20  to the District of Columbia, or whether the government is

21  moving to have her detained and will then undertake

22  transportation of the defendant to the district.

23          MR. LYNCH:  Correct, Judge.  Well, first, I think I'd

24  ask the Court to arraign her on the indictment.

25          THE COURT:  Yes, you're correct.

1          Ms. Kubiak, have you and Ms. Pascale Cecile Veronique

2    Ferrier received a copy of the indictment returned by the

3    grand jury sitting in the District of Columbia?

4          MS. KUBIAK:  We have, Your Honor.

5          THE COURT:  And does she waive the reading thereof

6    and enter a plea?

7          MS. KUBIAK:  Yes, Your Honor.  I waive a further

8    reading, and enter a plea of not guilty on her behalf at this

9    time.

10          THE COURT:  All right.  That brings us, then, to the

11    question of release of the defendant pending her appearance in

12    the District of Columbia on the indictment, or the government

13    moving to have her detained and then transported to the

14    District of Columbia.

15          MR. LYNCH:  Judge, the government is moving for

16    detention.  As indicated at the last proceeding, Your Honor,

17    the Court -- or, the government is moving under 18 USC

18    3142(f)(1)(A), in that the defendant is now indicted with a

19    crime of violence; that is, threatening the President of the

20    United States by sending in the mail an envelope that

21    contained not only verbal threats, but also contained the

22    toxin ricin, and that ricin has been confirmed by the National

23    Bioforensic Analysis Center.

24          In addition, the government is moving, pursuant to

25    3142(f)(2)(A), in that she is a serious risk of flight.

1          As the Court's aware, the government bears a dual

2   burden in this case based on its request for detention under

3   two provisions:  One is that by clear and convincing evidence,

4   that the defendant poses a danger to the community; and, two,

5   by preponderance of the evidence, that she is a serious risk

6   of flight.

7          In support of the government's proffer, Your Honor,

8   the first thing the government does, it relies on the

9   allegations contained in the criminal complaint, as well as

10  the now grand jury finding that there's probable cause to

11  believe that Ms. Ferrier did threaten the President of the

12  United States when she mailed that letter containing ricin to

13  him on September 18th.

14         In addition, Judge, the government notes that the

15  defendant is a Canadian citizen.  She also has French

16  citizenship, she carries a French passport.  And she's charged

17  with threatening to take the life and cause bodily harm to the

18  President of the United States.

19         The envelope also contained a letter, Judge, that if

20  the ricin didn't work, she would find another poison, or she

21  would come to the United States with her gun.

22         Marked as Government Exhibit Number 1, Judge, is, for

23  purposes of this hearing, is the envelope and the letter sent

24  to the President of the United States, Donald J. Trump.  It's

25  sent from Canada where the defendant resides.

1          And on page 2 of this exhibit, it includes the

2    threatening letter that was sent by Ms. Ferrier to the

3    President.

4          And I note in here several important things.  One,

5    the defendant threatened that if he doesn't give up the

6    election, he -- she made a special gift for him, which was the

7    ricin, to help him make the decision.

8          And then she said if it doesn't work, I'll find a

9    better recipe for another poison, or I might use my gun when

10   I'll be able to come.  Enjoy.

11         And then she ends it with Free Rebel Spirit.

12         And that language at the end, Judge, Free Rebel

13   Spirit, is important, because there were also letters

14   containing a white powdery substance that were sent to Texas

15   earlier in September.  And those letters contained similar

16   language used in the letter, including that it ends with Free

17   Rebel Spirit, in capital letters.

18         In addition, it also used the same language, "a

19   special gift for you," and that she would be coming with a gun

20   if she was able to get into the United States.

21         I've spoken with the AUSAs in Texas, Judge, and

22   preliminary reports are that four latent fingerprints from

23   those -- some of those letters in Texas have been linked to

24   Ms. Ferrier.  And, again, those letters are consistent with

25   the same letter that was sent to the President of the United

1  States on September 18th, 2020.

2       Now on September 20th, 2020, Ms. Ferrier attempted to

3  enter the United States at the Peace Bridge port of entry.

4  There, she was encountered by a Customs and Border Protection

5  officer.  When she failed to come into his inspection lane,

6  the officer went to the vehicle, approached it.

7       And at that point, the defendant said -- well, the

8  officer first asked, Is there anything you need?  Are you

9  okay?

10       And she said, No, I'm wanted by the FBI for the ricin

11  envelope.

12       It was at that point that she was taken from her

13  vehicle, she was handcuffed and searched.  And on her person,

14  marked as Government Exhibit Number 2, is a semiautomatic

15  handgun loaded with seven rounds of ammunition, and that's

16  contained on the second page of this exhibit.

17       So she's following through with her initial threat

18  that she made in the letter, not only to the individuals in

19  Texas, but to the President of the United States, that if the

20  ricin didn't work, she might use her gun when I'll be able to

21  come.

22       But it wasn't just a semiautomatic gun that she had

23  in her possession.  In Government Exhibit Number 3, she also

24  had in her pocket this spring knife.  And within her vehicle

25  in a backpack, she also had approximately 294 rounds of

1    ammunition, pepper spray, a stun gun, and a baton.

2              She was loaded for bear, Judge.

3              I mean, certainly 294 rounds of ammunition can do

4    great damage, let alone the seven rounds of ammunition that

5    were in that semiautomatic pistol that was on her person.

6              Later that afternoon, after she was detained, she

7    admitted that she had sent ricin to locations in Texas and to

8    the President of the United States.

9              In addition to her identification documents that she

10   had at the bridge, Judge, which included a Canadian passport,

11   a driver's license from Canada, she also had what's marked as

12   Government Exhibit Number 4, which is a Texas -- appears to be

13   a Texas driver's license in the name of Jane Ferrier.

14             Now, I confirmed with Texas law enforcement that this

15   is not a legitimate Texas driver's license.  The driver's

16   license number that's issued on this card is to another

17   person, and not Jane Ferrier.  And the person that's depicted

18   in this photograph appears to be the defendant, Ms. Ferrier.

19             Now, the information -- not only is the first name

20   incorrect, it's different, but also the date of birth is

21   different.  Her date of birth is actually May 8th, 1967.  And,

22   in fact, on this license, it's May 8th, 1974.

23             So she had, obviously, the ability to access

24   fraudulent documents to make her way throughout the United

25   States at the time without suspicion.

1          Now, that's not the only false identity document,

2     though, that she's had, because she had -- and I'll get to it

3     in a little bit, but in 2019 she had a similar Texas driver's

4     license, same number, same photo, same date of birth.  But

5     that original one from 2019, Judge, that's still in Texas in

6     evidence, along with the handgun that was found on her on

7     March 12th of 2019.

8          So we have two things, Judge.  We have the threats to

9     the President, and these weren't -- I mean, these weren't just

10    white powder, this is actual ricin, a toxin that can kill an

11    individual or cause serious bodily injury.  But thank goodness

12    for the protections that are already in place, mail that's

13    sent to the President is sorted, checked, inspected.  And it

14    was at that point that it was found, it was discovered, and

15    then it was sent out for testing, and found to contain ricin.

16         So it's on that basis, Judge, not only that the

17    government has moved for her detention based on her danger,

18    but also her risk of flight.

19         And the next thing I want to talk about, Judge, is

20    her pretrial services report.  And I proffer that report, the

21    contents of that report, and the recommendation of Officer

22    Brian Mamizuka who, as you know, Judge, he -- he works in an

23    independent agency.  He looked at the characteristics of the

24    defendant, he looked at the offense, and he determined that

25    there are no conditions or combination of conditions which

1   would assure not only against her danger but also against her

2   risk of flight.  And he stated a couple of things that I think

3   are important.

4          She has no status here in the United States.  She's a

5   dual citizen of France and Canada, and -- and I'll get to it,

6   Judge, but in 2019, Ms. Ferrier was arrested in Texas with her

7   French passport.  That passport was returned to her.  But when

8   Ms. Ferrier came to the border on September 20th of 2020, she

9   did not have that French passport with her.  That is not in

10  the government's possession at this point, so she apparently

11  still has access to it.

12         She has strong ties to France and Canada.  She only

13  moved to Canada in 2008, only became a citizen there in 2015.

14  She is a natural-born citizen of France, a place where she

15  could go should she be released.

16         She apparently has lost her job in Canada.  She has

17  access to false pass -- or, false identification documents,

18  and she has traveled overseas, as noted by Officer Mamizuka.

19         But also, the assessment of danger is that she had a

20  prior charge for carrying -- unlawfully carrying a weapon in

21  the United States.  She is an alien.  She was here illegally

22  in March of 2019, and she had with her in her possession a

23  semiautomatic handgun.

24         But not only the nature and circumstances of the

25  offense, and the fact that she had, at her time of her arrest,

1    a handgun, 294 rounds of ammunition, a baton, a stun gun,

2    those all indicate her dangerousness to this community, as

3    well as to the President of the United States and the

4    individuals in Texas who received similar letters.

5              Now, the Court also has to look at, Judge, the

6    factors set out in 3142(g), and I'm going to go over those

7    briefly, Judge.

8              The nature and circumstances of the offense charged.

9    This is a crime of violence.  So in that regard, that is a

10   factor that you have to consider as far as whether or not

11   release is appropriate.

12             And here, the facts set forth in the criminal

13   complaint, the criminal complaint alleges a pattern of

14   attempts to kill and cause bodily injury to the President and

15   the individuals in Texas.

16             As I noted, she was found in possession of a

17   semiautomatic handgun, more than 290 rounds of ammunition, a

18   knife, and other dangerous weapons.

19             It appears that the defendant was following up on her

20   threat to the President that she would come into the United

21   States with her gun.

22             There's no reason to believe, Judge, that if this

23   defendant is released, she won't in some way attempt to cause

24   bodily injury or kill the President or other individuals in

25   the United States.

1          The second factor you have to consider, Judge, is the

2    weight of the evidence, based on the evidence presented not

3    only in the criminal complaint, the admissions that the

4    defendant made regarding her involvement in these letters,

5    this is a strong case against the defendant.  The likelihood

6    of her conviction is high.  And, Judge, I would expect that in

7    light of the ricin that was sent to this -- to the

8    President -- or, I'm sorry, to the President and appear to

9    have been sent to the individuals in Texas, there are going to

10   be additional charges not only in the District of Columbia,

11   but also in Texas, and that creates another reason to flee.

12          And, in fact, I also expect that there may be charges

13   considered here in the Western District of New York, not only

14   for her possession of the fraudulent documents, but also for

15   her possession of a handgun.

16          You also have to look at the history and

17   characteristics of this defendant.  The defendant's history

18   includes a 2019 incident in Texas where, at that point, Judge,

19   she was found in possession of another semiautomatic handgun,

20   as well as a magazine that contained 12 rounds of ammunition.

21   And that photo of that handgun is set forth in Government

22   Exhibit Number 5, which is a three-page exhibit.

23          Here on page 2 of the exhibit, you'll see that she

24   has a baton, it's a collapsible baton, in her possession, as

25   well as pepper spray, and then just another photograph of the

1    ammunition and the magazine that contained 12 rounds of

2    ammunition.

3            She also had in her possession at that time, Judge, a

4    ballistic vest.

5            These aren't hunting rifles, Judge, this is a

6    semiautomatic pistol.  She's got other weapons that she'd be

7    able to use.  But she also had in her possession in 2019 a

8    ballistic visit.  That's, I think, a significant factor to

9    consider also, Judge.

10           This is not, again, a lawful citizen in possession of

11   a firearm, this is an alien of the United States with a

12   semiautomatic handgun not registered to her, and she's got a

13   ballistic vest.  She also had a knife at that time.

14           And as set forth in Government Exhibit Number 6,

15   Judge, she had this identification card, driver's license.

16   Again, in Jane -- the name of Jane Ferrier, date of birth

17   May 8th, 1974.  The same driver's license number for the one

18   that I previously marked in Government Exhibit Number 4.

19           And I confirmed with the law enforcement in Texas

20   that this driver's license is still in Texas.  So she has had,

21   within the last year and a half, she has gotten access to two

22   fraudulent driver's licenses in a name of another person,

23   using a driver's license number that goes with another person

24   and that has her photograph on it.

25           This is strong evidence that she is a serious risk of

1   flight.  But when you consider the charges here, not only -- I

2   realize the charge right now is only a maximum penalty of five

3   years, but the likelihood of conviction, Judge, and the

4   recommended guideline range, Judge, I would expect to be quite

5   high here, and that she would be facing at least -- even at

6   this point, a substantial prison term, and that gives her a

7   strong reason to flee.

8           And are there really any conditions, Judge, that

9   could be imposed here?  Because she goes to Canada, she cannot

10  be supervised by U.S. law enforcement.

11          And, Judge, if I can just look at my phone real

12  quick.  I received an email today prior to the proceeding,

13  which I showed to defense counsel, but -- or, I shared with

14  defense counsel, that the Canadian National Microbiology

15  Laboratory conducted a molecular analysis of samples taken

16  directly from a mortar and pestle seized from Ms. Ferrier's

17  residence in Quebec, and confirmed the presence of ricinus

18  communis nucleic acid, and it tested positive for ricin.

19          So that's another indication, another piece of

20  evidence, that links not only this defendant to the mailings,

21  but also to the ricin that was sent to the President of the

22  United States.

23          The final factor you have to consider, Judge, is the

24  danger posed to the community.  And there is no greater threat

25  to the community than taking someone's life or causing bodily

1  injury to someone.  And it is clear that this defendant has

2  the desire to kill the President of the United States, and

3  individuals that she feels somehow wronged her in Texas when

4  she was arrested in March of 2019.

5       When she was arrested, not only had she sent the

6  ricin previously, but she was in possession of that

7  semiautomatic handgun and more than 290 rounds of ammunition

8  which, again, demonstrate that if she's released, there's no

9  reason to believe that she won't stop in her efforts to kill

10  the President or the individuals in Texas or others.

11       So, Judge, based on that, we believe the government

12  has established by clear and convincing evidence that this

13  defendant poses a danger to the community.  And, Judge, I

14  think likewise, by a preponderance of the evidence, the

15  government has established that she is a serious risk of

16  flight.  Again, she has no status in the United States.  She

17  has a Canadian and French citizenship.  She has access to

18  false identity documents.  And we'd ask that you find, Judge,

19  that there are no conditions, or combinations of conditions,

20  which will assure against her danger and her risk of flight.

21       And, Judge, just so the record is clear, I provided

22  Ms. Kubiak with all of these exhibits approximately two hours

23  in advance of the hearing.  So she not only has the documents

24  I was going to rely upon, but she also received photos of the

25  items seized from -- some of the items seized from

1    Ms. Ferrier.  Last week I provided them to her.

2          Thank you, Judge.

3          THE COURT:  Ms. Kubiak?

4          MS. KUBIAK:  Yes, Your Honor, thank you.

5          Thank you, Judge.  As Ms. Ferrier sits here today,

6    she is presumed innocent, and that is one of the central

7    tenets of our criminal justice system.  So with respect to

8    what Mr. Lynch has just proffered here, I think that I'm

9    asking the Court to keep that in its purview as we go through

10   some of the allegations that were made.

11         In addition, the Bail Reform Act is clear that

12   nothing in the section of the Act shall be construed or

13   modifying or limiting the presumption of innocence.

14         As the government has just proffered, she's been

15   charged in a one-count indictment, Judge, with 18 USC 871,

16   which carries with it a statutory maximum penalty of five

17   years.  And as Mr. Lynch indicated, there's no mandatory

18   minimum sentence attached to that charge.  And the statutory

19   maximum of five years is one of the more lenient statutory

20   maximums defendants face in criminal court.

21         While detention is permissible, under 3142(f)(1), as

22   the government has proffered, it is not presumptive.

23         Former Chief Justice William Rehnquist reminds us in

24   United States versus Salerno, 481 U.S. 739, that as it relates

25   to pretrial defendants, liberty is the norm, and detention

1    prior to trial or without trial is a carefully limited

2    exception, Your Honor.

3           As the government indicated, the government has to

4    prove beyond a preponderance of the evidence that Ms. Ferrier

5    is a serious risk of flight.  The risk has to be serious, not

6    just a risk.

7           Second, the government must prove dangerousness by

8    clear and convincing evidence, and that there are no

9    combination of conditions that will reasonably assure the

10   safety of any other person in the community.

11          We submit that the government has not met those

12   burdens here today.

13          3142(g) provides the factors that this Court needs to

14   consider when making a bail determination.  The government has

15   focused and highlighted on two of those conditions, which are

16   nature and circumstances of the offense charged, and the

17   weight of the evidence.  But, Judge, those are only two

18   factors that the Court has to consider.

19          And under (g)(3)(A), the Court has to consider the

20   history and characteristics of the person, Ms. Ferrier.  I

21   submit that those history and characteristics are more

22   compelling than the two factors that Mr. Lynch outlined today.

23          Judge, she's 53 years old, she is a naturalized

24   citizen in Canada, and has resided in Valence, France, or

25   Montreal, Quebec, Canada, her entire life.

1          As Mr. Lynch indicated, she became a naturalized

2    Canadian citizen in 2015, and from 2008, she has resided in

3    the same suburb of Montreal.  Prior to that, she lived her

4    entire life in Valence, France.

5          She has had a sustained and stable residence her

6    entire life.  So when the probation office uses catch phrases

7    in their report such as "transient lifestyle," they really

8    have no value.  The probation office overemphasizes the nature

9    and circumstances of the offense, and completely ignores the

10   history and characteristics of Ms. Ferrier.

11         And, Judge, I would indicate that the recommendation

12   for detention was made prior to the interview, so they were

13   not taking into consideration any of the history and

14   characteristics of the defendant when the recommendation for

15   detention was made.

16         I think her history and characteristics warrant

17   release.  She's a highly educated individual.  She has the

18   equivalent of a master's degree in engineering from France.

19   And she has significant other training and certificates and

20   degrees from Montreal.

21         The report even indicates that her son describes her

22   as a software genius, and I think her history and employment

23   bears that out.

24         She has strong ties to her community in Montreal, and

25   she's always been gainfully employed.

1          She was honest with probation during the pretrial

2     services report.  And by all accounts of the government, she

3     was fully forthcoming to the CBP officers when they

4     encountered her on the bridge.

5          Ms. Ferrier has strong family ties, and her family

6     remains very supportive, and have indicated to me that they

7     will assist her and support her should this Court grant her

8     release.  They have the ability to act as third-party

9     custodians.  They have a support network in place for her, if

10    she cannot return to her previous residence, she can reside

11    with her son in Quebec.

12         She also does have some family ties in Texas, and

13    they may be willing to allow her to reside with them should

14    this Court be inclined to release her but not allow her to

15    return to Quebec, Canada.

16         Judge, as I indicated, she had sustained and steady

17    employment throughout her entire life, and I think her

18    employment has been rather exceptional.  Up until the date of

19    her arrest, she was working for an aircraft engineering

20    company.  And while she indicates to the probation department

21    that she may not be able to return, she's speculating there,

22    and she has no idea whether or not she might be allowed to

23    return should this Court release her.

24         In addition, based upon her stellar résumé, I think

25    that she might be able to obtain other prospective employment

1  opportunities if released.

2          As I indicated, Judge, she lived in the suburb of

3  Laval in Quebec for the past 12 years.  Prior to that, she did

4  reside in France, but she has not returned there in over 12

5  years.

6          Mr. Lynch references her French passport.  Well, I

7  don't think you have any obligation to travel with both dual

8  citizen passports, and she was traveling with her Canadian

9  passport, which the government is in possession of.

10          She indicated to pretrial services that her French

11  passport is in her residence, and if released, that passport

12  can certainly be surrendered to the Court.

13          She has extensive community ties.  She has

14  volunteered at Habitat for Humanity in Quebec.  She has

15  volunteered for four years as Moisson Laval, which is a social

16  assistance and skilled development program where you're linked

17  up with other individuals to mentor and assist them.  And

18  she's also volunteered at a local theater company by doing

19  their website development.

20          She has absolutely no history of drug or alcohol

21  abuse.

22          Mr. Lynch puts tremendous focus on the charges that

23  were in Texas in March of 2019.  However, Judge, I would note

24  in Defendant's Exhibit 1, those charges were dismissed on

25  May 17th, 2019.  She served 20 days in pretrial detention, and

1    then was released.

2          In Defendant's Exhibit 2, which is I think more

3    telling, it specifically says that the charges don't meet the

4    offense.  So the officials in Texas made a determination that

5    not only were they not going to pursue the charges, they made

6    a specific finding that the charges do not meet the elements

7    of the offense charged.  She was released, and she was allowed

8    to remain in the United States, and voluntarily remove herself

9    a month later.

10         When Mr. Lynch says that she was here illegally,

11   there is absolutely no evidence of that, Judge.  She was not

12   in the United States illegally at the time.  The ICE detainer

13   or charge that's reference in the report was dismissed, and

14   based on our communications with ICE, they indicated it was

15   improvidently issued.  Well, that tells me that it should have

16   never been issued in the first instance, that they didn't have

17   any cause or basis to file the charge.

18         So after she's released on May of 2019, she's free to

19   go.  She's allowed to remain in our country.  And then she

20   voluntarily removes herself subsequently thereafter.

21         With respect to the departure, she showed that she

22   can comply.  She was instructed to depart back to Canada, and

23   she complied with those requests, and she did what she was

24   told.

25         As to risk of flight, Judge, I think that the factors

1  for nonappearance that the pretrial services lists, all of

2  those can be ameliorated with travel restrictions, request to

3  surrender travel documents, preclusion of travel outside of

4  the United States or Montreal, Quebec, and those can be

5  utilized in lieu of incarceration.

6          But I think the most important factor with respect to

7  risk of flight is, even based upon the government's own

8  proffer, she voluntarily came to the border, said that she was

9  the person they were looking for when there hadn't even been a

10  warrant issued.  She wasn't absconding.  She wasn't avoiding.

11  She came to the bridge and said, I understand from news

12  reports that I'm the person you're looking for.

13          So if somebody were going to run or flee, they

14  certainly do not engage in that type of conduct, Judge.

15          She also, when asked, if -- according to the

16  government's proffer -- if she had any weapons, she

17  immediately disclosed to them that she did, and they located

18  what she told them that she was in possession of.

19          That's not somebody trying to sneak into the country,

20  somebody trying to avoid or evade capture.  That is somebody

21  addressing what she sees in the news report as somebody

22  wanting her and her saying, I'm here to address whatever it is

23  that's out there with respect to me.

24          There is an ICE detainer, Judge, as Mr. Lynch

25  indicated.  However, the fact that she has no legal status and

1  there is an ICE detainer does not preclude or presume

2  detention.  It's a factor to be considered, Judge, but it is

3  not an assessment as to risk of nonappearance, and an

4  involuntary removal does not create or rise this to a serious

5  risk of flight.

6          As to the nature and seriousness of danger posed to

7  any person in the community, again, Judge, I referenced the

8  fact that she came when she heard that they were looking for

9  her.  When she arrived, they asked her if she was in

10 possession of anything.  And according to the government's

11 proffer, she apparently indicated that she did have something,

12 and they have all of that.  So they are in possession of

13 everything that she had, and she did not hide or disclose

14 that.

15         I think that the allegations are clearly an anomaly

16 of somebody who, for 53 years, has led a law-abiding life.

17         And when Mr. Lynch says she's loaded for bear?  Well,

18 then, if she was loaded for bear, and she had ill will and

19 intentions, she certainly would not have come to the border

20 and say, Here I am.

21         With respect to the driver's license, Judge, I do

22 indicate, I notice that the document is, in fact, the same

23 document from Texas.  I don't know, there were two of them

24 apparently.  She was not charged with that crime.  She was --

25 those charges were also dismissed.  So with respect to conduct

1    of assuming somebody else's identity, Texas did not feel it

2    necessary to pursue those charges, and dismissed those charges

3    as unsubstantiated.

4            So I think you have a balancing that you have to do

5    between the 3142(g) factors, Judge.  And I think if you weigh

6    those in their entirety, there are a combination of conditions

7    that can reasonably assure the appearance of Ms. Ferrier and

8    assure the safety of any other person in the community with

9    release.

10           Some of the proposed conditions would be third-party

11   supervision; that she seek or maintain employment that she

12   previously had; observe residency, travel, and associational

13   restrictions.  As I indicated, she can surrender all her

14   travel documents.  I believe that the government actually is

15   in possession of all of those, except for her French passport,

16   which she's in a position to surrender if released; avoid

17   contact with victims or witnesses; maintain regular reporting

18   requirements; obey a curfew; adhere to any firearms or weapons

19   restrictions; avoid alcohol or controlled substance abuse.

20           She can enter a security bond.  The Court can also

21   impose a financial bond which her family may be in a position

22   to post and secure for her.

23           And as I indicated, Judge, if the Court were inclined

24   to release her, but not allow her to return to Canada, there

25   may be other alternative residence in the United States.  And

1    if the Court were to allow that, they could -- the Court could

2    also order location and computer monitoring.

3          We have, in other cases with Canadian nationals,

4    Judge, had an irrevocable waiver of extradition executed,

5    together with some financial surety.  And the Court has, in

6    the past, released Canadian citizens.  And she can comply with

7    any other Court-imposed condition that this Court deems

8    necessary to assure her appearance or ameliorate any danger to

9    the community.

10         Thank you, Your Honor.

11         THE COURT:  Mr. Lynch, anything you want to add?

12         MR. LYNCH:  Judge, yeah, just a few things.

13         Judge, I just want to touch on a few things.

14         1.  The irrevocable waiver of extradition, Judge, is,

15   as this Court is well aware, that's a meaningless document.

16   The Canadian government does not recognize it at all.  It will

17   not assist the United States in extraditing the defendant

18   should she go to Canada and not return.

19         But I really want to hammer on a couple things,

20   Judge.  The proposed conditions here simply cannot ameliorate

21   the danger that this defendant poses.

22         She has access, apparently, to castor beans, which is

23   necessary to the creation of ricin.  This is a highly

24   regulated, highly, tightly-controlled substance, and this

25   defendant apparently has access to it.  She mailed it to the

1   President.  She mailed it to people in Texas.  She had it in

2   her residence in Canada.  There's no reason to believe that

3   she wouldn't be able to have access to it again, and seek to

4   harm not only the individuals she apparently is upset with

5   right now, but future individuals.

6         In addition, Judge, she apparently has regular access

7   to semiautomatic handguns.  She was caught in 2019 with a type

8   of gun, a .9 millimeter gun.

9         She's got another gun, a different gun, in 2020 when

10  she's arrested at the Peace Bridge.  294 rounds of ammunition.

11        She's got access to fraudulent identification

12  documents, as demonstrated by her two false Texas driver's

13  licenses.  There's no reason to believe she can't obtain other

14  documents.

15        And I think, Judge, really, the last point is, she

16  regularly has access to dangerous weapons, including stun guns

17  pepper spray, ballistic vest, batons, and that's in addition

18  to all the more serious items, including the handguns and the

19  ammunition.

20        Judge, I think that there are no conditions or

21  combination of conditions which would assure against her

22  danger to the community, a well as her serious risk of flight.

23  And, therefore, we ask the Court to detain her pending her

24  transfer to the District of Columbia.

25        Thank you, Judge.

1          THE COURT:  I have a -- I have a question about the

2    Texas driver's license.

3          MR. LYNCH:  Sure, Judge.

4          THE COURT:  You've indicated she had two Texas

5    driver's licenses.  When I reviewed the government's exhibits,

6    more specifically Government Exhibit 4 and Government

7    Exhibit 6, the information contained in each of those exhibits

8    seems to be exactly the same.

9          MR. LYNCH:  They are.

10          THE COURT:  So I'm just trying to get a little bit

11    better understanding of how it came to be that you say there

12    were two licenses.

13          MR. LYNCH:  Because the first -- or, the one in -- in

14    Government Exhibit Number 6, Judge, it's still in Texas.  It's

15    in evidence in the Texas police custody, and I confirmed that.

16          So, now, Government Exhibit 4 is the one she was

17    seized at on the Peace Bridge, so it's a separate document

18    itself.

19          THE COURT:  All right.  In considering the issue of

20    whether the defendant should be released pending her

21    appearance in the District of Columbia to answer on the

22    charges contained in the indictment from that district, it's

23    the obligation of this Court to take into account and

24    consideration all of the facts and circumstances and other

25    information that have been made known to the Court, and to

1  consider all of that information in its totality.

2        Even though the defendant may not be a citizen of the

3  United States, she nevertheless is a beneficiary of the

4  constitutional rights and protections contained in the

5  Constitution.  And one of those rights and protections is the

6  presumption of innocence, and that is a right that cloaks her

7  as far as these charges are concerned.

8        The Bail Reform Act of 1984 as amended also contains

9  a presumption of innocence to an individual charged with a

10  crime, and I acknowledge and consider that presumption as part

11  of the totality of circumstances in reaching my decision in

12  this case.

13        The government has proffered evidence to establish

14  that the defendant:

15        1.  Is not a citizen of the United States;

16        2.  That she has the ability to travel within the

17  United States;

18        3.  That such ability to travel is also accommodated

19  by, allegedly, the use of false documentation.

20        The government proffers the two Texas driver's

21  licenses, further representing that investigation has

22  determined that the driver's license in question, in fact,

23  belongs to someone else in Texas, and that there are two

24  separate Texas driver's licenses, even though they contain the

25  same information.  And this is based on the representation

 1    that when the defendant originally encountered entanglement

 2    with law enforcement in Texas, that driver's license was taken

 3    from her and is in the possession of Texas authorities.

 4          The government further represents that at the time of

 5    her arrest in this case at the Peace Bridge, they found the

 6    second identical Texas driver's license.  And, once again,

 7    those were referred to as Government Exhibits 6 and 4.

 8          Defense counsel stresses the factors that I must

 9    consider under Title 18 of the United States Code,

10    Section 3142, and she does so rightly.  And in reviewing those

11    factors, I note that the first factor put forth is as follows.

12          Quote:  The nature and circumstances of the offense

13    charged, including whether the offense is a crime of violence,

14    a violation of Section 1591, a federal crime of terrorism, or

15    involves a minor victim or a controlled substance, firearm,

16    explosive, or destructive device.

17          And that's what I am considering as the foundation

18    with respect to the most important factor in the context of

19    the charge in the indictment, and what previously had been

20    charged in the criminal complaint issued against the

21    defendant.

22          Experience has established that ricin is a highly,

23    highly toxic substance, a dangerous substance, a highly

24    controlled substance, and not easily obtainable legally.

25          The government has proffered that not only did the

1   envelope addressed to Donald J. Trump, The White House,

2   1600 Pennsylvania Avenue, Northwest, Washington, D.C., 20500,

3   USA, contained ricin, as established by a laboratory analysis,

4   counsel advises that Canadian authorities in the province of

5   Quebec where the defendant resides, my understanding is in the

6   community of Laval, also conducted laboratory or forensic

7   analyses of items found in the defendant's apartment, wherein

8   and whereby traces of ricin were found on the objects

9   evaluated or examined.

10          Unfortunately, this country has a history of

11  witnessing assassinations and attempted assassinations of the

12  President of the United States going back to Abraham Lincoln,

13  and then William McKinley here in this very City of Buffalo,

14  New York, the attempted assassination of Ronald Reagan, and

15  now numerous threats that have been made allegedly by the

16  defendant against Donald J. Trump.

17          And in support of the government's position that

18  there, in fact, were threats made, the government has

19  submitted Exhibit 1, the letter that was found, along with the

20  envelope that I referenced, wherein it is expressly stated

21  that the person who sent that note indicates, quote, you

22  ruined the USA and lead them to disaster.  I have U.S.

23  cousins, and I don't want the next four year with you as

24  President.  Give up and remove your application for this

25  election.  So I made a special gift -- and special gift is in

1    quotes -- for you to help you make a decision.  This gift is

2    in this letter -- and the contents of the letter, as the

3    government has, represented was ricin.

4          The letter goes on -- or, the note goes on to say, if

5    it doesn't work -- meaning the special gift -- I'll find a

6    better recipe for another poison, or I might use my gun when

7    I'm able to come.

8          That brings me to Government Exhibit 2, which is the

9    photograph of the automatic weapon, a handgun, and the seven

10   shells.  Apparently, that would be ammunition that would be

11   operable in that gun.

12         Government Exhibit 3, which is the spring knife, that

13   was allegedly taken from the defendant when she was arrested

14   at the Peace Bridge, as was Government Exhibit 2.

15         Government Exhibit 3, which is another handgun, and

16   12 rounds of ammunition that would be utilized in that weapon,

17   along with a baton and, finally, the bulletproof vest.

18         In this day and age, once again, experience has

19   demonstrated and established that people intent on committing

20   violence oftentimes not only have weapons and substantial

21   information -- ammunition, but they also have protective gear

22   that they utilize, such as a bulletproof vest and other types

23   of protective gear.

24         The government also referenced that there were large

25   or a substantial quantity of ammunition found in the

1  defendant's vehicle at the time of the arrest at the Peace

2  Bridge, as well.

3           Those factors that I just iterated -- involving

4  ricin, and weapons, and ammunition -- and the context of the

5  note contained in the letter, Government Exhibit 1, certainly

6  establish by clear and convincing evidence a threat of

7  violence, a threat of harm to the point of death.

8           And when I say that, I reiterate at the same time the

9  presumption of innocence to which the defendant is entitled,

10  because those are issues that will have to be established and

11  resolved at a trial.  But for purposes of this hearing, as to

12  whether the defendant should be released or not, those

13  representations and those pieces of evidence submitted by the

14  government are sufficient for me to conclude that they clearly

15  establish this defendant's capability to commit, or to threat

16  to commit -- threaten to commit acts of violence, including

17  bringing about the death or the homicide of a third party.

18           The use of false identity as alleged by the

19  government also indicates an ability by the defendant to hide,

20  perhaps, her true identity when traveling around, and gives

21  her the means by which she could travel within the United

22  States under that false identity.  It's a means by which,

23  should she be released, she could utilize to commit flight.

24           If she were released and allowed to return to Canada,

25  that creates problems of supervision, as the government

1    rightly points out, the U.S. Probation Department would not be

2    in a position to monitor her.

3           If she violated any of the terms and conditions I

4    were to impose, the ability to enforce those regulations or

5    terms and conditions would be practically nil.

6           If there was to be an attempt at extradition, my own

7    professional experience establishes that that is a very

8    lengthy, time-consuming process, and is not always successful.

9           I point out, for example, even though it's not

10   related to the facts of this case, the situation involving the

11   Chinese woman who is presently in Vancouver, and the amount of

12   time that has already expired in the attempts of the United

13   States government to have her extradited from Canada to answer

14   charges in this country.  So, it's not an easy thing.

15          And counsel for the government rightly points out,

16   because I've had this experience on the bench, where someone

17   has signed a document entitled waiver of extradition, and the

18   Canadian courts have said they don't acknowledge that as being

19   an effective waiver, so it's a nullity.

20          When I go through the process of the other factors,

21   the second factor, being the weight of the evidence against

22   the person, once again, recognizing the presumption of

23   innocence, but it would appear to me that what has been

24   proffered by the government here today and as evidenced by the

25   exhibits submitted, coupled with a grand jury finding probable

1  cause for these charges by reason of the indictment that has

2  now been returned, it would appear to me the government has a

3  very strong case, especially assuming the legal validity of

4  the alleged admissions made by the defendant at the border or

5  at the time of her arrest at the Peace Bridge about being the

6  person the government was looking for for having sent a letter

7  to the President, the government does have a very strong case.

8          The history and characteristics of the person, that

9  would be Ms. Ferrier, are limited through no fault of her own.

10  But there's very little, really, in the way of background

11  that's been documented or established, other than the fact

12  that the defendant has dual citizenship, being a citizen of

13  France and being a citizen of Canada.

14          Counsel has represented that she does have an

15  educational background as an engineer, that she had employment

16  as an engineer, and that she has family in locations.  But

17  basically, that's the extent of it.

18          The pretrial services report is very limited.  It

19  only makes reference to the two events in Texas which, quite

20  frankly, were considered apparently minor in nature by reason

21  of the dispositions that occurred.

22          But I see nothing that has been proffered or

23  submitted in the way of documentation that would cause the

24  third factor, that is, the history and characteristics of

25  the -- of the defendant to outweigh what has been presented by

1    the government as to the nature and circumstances of the

2    offense charged and the weight of the evidence against the

3    defendant as to these charges.

4         The one other characteristic belonging to the

5    defendant, of course, is her non citizenship, and being a

6    citizen of France and Canada which, once again, increases the

7    possibility of her being able to return to either one of those

8    two countries should she be released and she undertakes

9    flight, which presents, then, the legal problems of

10   extradition.

11        The fourth factor describes it as being one that

12   involves the nature and seriousness of the danger to any

13   person or the community that would be posed by the person's

14   release.  In this case, we're talking about the President of

15   the United States having allegedly been threatened by the

16   defendant as set forth in the indictment.

17        So that, coupled with Government Exhibit 1, the

18   envelope addressed to Donald J. Trump, and the note clearly

19   established that this is -- would be an ongoing threat, at

20   least according to the writer of the note, wherein and whereby

21   it is stated, so I made a special gift for you to help you

22   make a decision.  This gift is in this letter -- once again,

23   being the ricin.

24        That's an act of violence, and more than a threat to

25   harm the recipient of that letter.

1          But then the writer goes on to say, If this doesn't

2    work, I'll find a better recipe for another poison -- which

3    indicates an intention to continue in the efforts -- or I

4    might use my gun when I'll be able to come.

5          And we have established by way of what the government

6    proffered in the Exhibit 5 and the other, this defendant

7    possessed weapons that were retrieved in Texas and in the

8    Western District of New York at the time she was arrested at

9    the Peace Bridge, along with large quantities of ammunition,

10   along with a spring knife.

11          That, too, would be indicative of not only the

12   continuing threat to do the act of harm, but that there was

13   the wherewithal by which that harm could be carried out,

14   weapons, two guns or one gun and ammunition, a baton, a spring

15   knife, or getting other poisons.

16          So when I consider all of that in its totality, I

17   conclude that there is clear and convincing evidence, that the

18   defendant does constitute a continuing danger to the President

19   of the United States, as well as to members of the community,

20   which would include those in Texas that she has allegedly

21   threatened, as well as anybody else within the confines of the

22   United States.  And that there is also a preponderance of the

23   evidence to find probable cause that she is a risk of flight

24   by reason of the false identity documentation and her lack of

25   citizenship in this country.

1           And, therefore, for those reasons, I am granting the

2    government's motion, and hereby order her detained and

3    remanded to the custody of the United States Marshal Service

4    for the purpose of transporting her as soon as reasonably

5    possible to the District of Columbia for purposes of

6    responding to the indictment returned in that district.

7           I am also reserving the defendant's right to renew

8    her claim for consideration of bail, and any other rights that

9    she wishes to put forward at the time of her appearance in the

10   district.

11          I think that completes all that needs to be done in

12   this Court.  Anything further, Ms. Kubiak?

13          MS. KUBIAK:  Judge, just with respect to her

14   transfer, we have experienced in other cases a tremendously

15   long delay on their transfer, and they bounce all over the

16   country, and it's taken months.  I would ask that the Court

17   direct the marshals to transport her forthwith, in that the

18   statute really reflects that they have ten days to do so.

19          THE COURT:  Mr. Lynch?

20          MR. LYNCH:  Well, Judge, I -- I -- I agree that she

21   should be transferred as soon as possible.  I think we live in

22   a time right now where people's travel around the country

23   is -- is limited by virtue of the pandemic and coronavirus.

24   So while I trust that Marshal Service will endeavor to move

25   her as quickly as possible, I also understand that there are

1    precautions that need to be put in place that make this sort

2    of an extraordinary situation that we're facing, and that we

3    haven't faced in more than a hundred years.

4            So with that acknowledgment, I still think the

5    Marshal Service will do their best, I just don't know that ten

6    days is going to be what they're going to be able to do.

7            MS. KUBIAK:  Judge, I would reserve any of her Speedy

8    Trial rights with respect to the transfer, and allow the

9    District of Columbia to assert those should there be undue

10   delay in her transfer.

11           THE COURT:  That reservation is granted.  But as you

12   heard me state in my directive when I remanded the defendant

13   to the custody of the U.S. Marshal Service or the Attorney

14   General of the United States for transport to the District of

15   Columbia, I stated that it be done as soon as reasonably

16   possible, which would take into account all of the factors and

17   circumstances that we now are faced with in these days,

18   including the COVID-19 pandemic.

19           MR. LYNCH:  Thank you, Judge.

20           THE COURT:  Anything further?

21           MR. LYNCH:  No.

22           MS. KUBIAK:  No, Your Honor.

23           THE COURT:  Thank you, everyone.  Stay safe.

24           (Proceedings concluded at 3:22 p.m.)

25           *     *     *     *     *     *     *

1                        CERTIFICATION

2

3             I certify that the foregoing is a

4        correct transcription of the proceedings

5        recorded by me in this matter.

6

7

8

9                    s/ Ann M. Sawyer
                     Ann M. Sawyer, FCRR, RPR, CRR,
10                   NYRCR, NYACR, Notary Public
                     Official Reporter
11                   U.S.D.C., W.D.N.Y.

12

13

14

15

16

17

18

19

20

21

22

23

24

25